RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0299p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

BRENDA BROOKS,
  *Plaintiff-Appellant/Cross-Appellee,*

  *v.*

DAVID ROTHE et al.,
  *Defendants-Appellees/Cross-Appellants.*

Nos. 08-1099/1195

>

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 06-14939—Thomas L. Ludington, District Judge.

Argued: June 17, 2009

Decided and Filed: August 21, 2009

Before: MOORE and GILMAN, Circuit Judges; PHILLIPS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jason J. Liss, FABIAN, SKLAR & KING, P.C., Farmington Hills, Michigan, for Appellant. Megan K. Cavanagh, GARAN LUCOW MILLER, P.C., Detroit, Michigan, Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, P.C., Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Jason J. Liss, FABIAN, SKLAR & KING, P.C., Farmington Hills, Michigan, for Appellant. Megan K. Cavanagh, Roger A. Smith, GARAN LUCOW MILLER, P.C., Detroit, Michigan, Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, P.C., Farmington Hills, Michigan, for Appellees.

GILMAN, J., delivered the opinion of the court, in which PHILLIPS, D. J., joined. MOORE, J. (pp. 15-20), delivered a separate dissenting opinion.

_____

[*]The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  Brenda Brooks, an employee of a domestic violence shelter, called 911 when one of the shelter's residents showed symptoms of a drug overdose.  But, adhering literally to the shelter's policy of not admitting law enforcement personnel without a search warrant, Brooks repeatedly refused to admit or give any information to the police officer who responded to the call.  After giving several warnings to Brooks that he needed to come inside the shelter to secure what he believed to be a crime scene, and that if she did not cooperate she would be arrested, the officer placed Brooks under arrest for resisting and obstructing a police officer.  The charge against Brooks was later dropped.

Brooks then sued the officer, along with a number of other individual officials and municipal entities, for violating her constitutional rights when she was placed under arrest.  The district court granted summary judgment to the defendants, holding that the officer was justified in his warrantless entry into the shelter because of exigent circumstances—specifically, a concern about the imminent destruction of evidence.  Because the court found that no constitutional violation had occurred, it held that the individual defendants were entitled to qualified immunity and dismissed Brooks's remaining claims against the municipal entities.  Brooks now appeals that ruling.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

Brooks worked as a shift attendant at the Huron County SafePlace, a shelter for victims of domestic violence.  SafePlace's policy and procedures manual, which Brooks had received, stressed the importance of resident confidentiality.  It instructed employees to contact their supervisors if law enforcement personnel wanted access to the shelter, and stated that "[a]ll searches must be conducted upon the authority of a search warrant."

In the early morning hours of May 8, 2006, Brooks was the sole employee working at SafePlace. Her shift was scheduled to last from midnight to 8 a.m. At around 4:30 a.m., Brooks went outside with one of the residents (whom the defendants refer to as MR), to smoke a cigarette. MR complained of back pain, had difficulty walking and sitting, and needed help in climbing the stairs. At breakfast a few hours later, Brooks noticed that MR was uncoordinated and had trouble walking and standing. Brooks grew concerned about MR's health and repeatedly asked her if she needed medical attention. MR declined to seek treatment, but when she tried to stand up, she staggered and could not walk.

Another resident kept an eye on MR while Brooks went to the telephone to call Amy Kain, the Managing Director of SafePlace and Brooks's supervisor. Kain told Brooks to defer to MR's wishes regarding medical treatment. Brooks returned to speak with MR and urged her to seek medical attention. MR eventually agreed.

Shortly after 7 a.m., Brooks called 911 to report that there was a woman at SafePlace complaining of back pain who needed medical attention. While waiting for the ambulance to arrive, Brooks checked on MR and told the other residents at the shelter what was happening.

The first person to arrive at SafePlace after Brooks's 911 call was Lieutenant David Rothe of the Bad Axe, Michigan Police Department. Rothe came to the door, identified himself as a police officer, and said that he was there in response to the 911 call. He asked to enter the shelter, but Brooks refused to let him in or to give him any information. Brooks felt uncomfortable giving Rothe any information because he was not with the ambulance. She was suspicious, in light of past incidents of husbands attempting to locate their wives at the shelter, as to whether Rothe was indeed a police officer. Rothe, growing frustrated, explained to Brooks that he was a first responder and needed to come into the building. After Brooks again refused to admit him, Rothe did not pursue the matter further and left SafePlace.

Shortly after Rothe's departure, the ambulance arrived, and Brooks let the paramedics into the shelter. Brooks again called Kain while the paramedics were

attending to MR in order to get Kain's permission to copy MR's file for the paramedics. During this conversation, Kain was informed that Brooks had refused to let Rothe enter the shelter. Kain testified that she told Brooks "He's fine, you can let him in." Brooks, however, denied that she was ever told by Kain to admit Rothe.

At about the same time, Brooks received a call from defendant Elizabeth Weisenbach, who identified herself as a Huron County assistant prosecutor and a SafePlace board member. Weisenbach demanded information about the events at the shelter and yelled at Brooks for not letting Rothe enter the building. Brooks refused to give Weisenbach any information and hung up the phone.

Brooks was not forthcoming with information for the paramedics who were attending to MR. The paramedics observed that MR was drooling and unresponsive and noted that her symptoms were consistent with a drug overdose. Additionally, an unknown resident approached one of the paramedics and told the paramedic that she had seen MR with a plastic bag containing Soma and Ativan pills. (Soma is a powerful muscle relaxer, and Ativan is a benzodiazepine, a type of drug used to treat anxiety disorder.) The resident did not know if MR had actually taken the drugs. MR was taken to the hospital shortly thereafter.

After the paramedics left, MR's roommate at SafePlace (JL) told Brooks that she had seen MR take three white pills from a plastic bag. JL gave the empty plastic bag to Brooks, who locked it up in the cabinet reserved for the residents' prescription drugs. (The residents were not allowed to keep medication in their shared bedrooms.) Brooks became concerned at this point that MR had suffered from a drug overdose, but did not report this information to anyone else. At least one child had shared a room with MR, which left the child at continued risk of exposure to drugs in that room. Brooks encouraged the other residents to retreat to their bedrooms, which most did.

Around this time, Kain called SafePlace and asked if Brooks could work an extra hour, until 9 a.m., because Kain was running late. Brooks then told Kain about the call she had received from Weisenbach, but Kain told Brooks not to worry about it.

Meanwhile, after Brooks refused to let him enter SafePlace, Lieutenant Rothe called Weisenbach and told her that he had been denied entry to SafePlace. Weisenbach responded that she would take care of the matter. Rothe then contacted his boss, defendant Police Chief John Bodis, and reported what had happened at the shelter. A short time later, Bodis received a call from his wife, who was a supervisor at the 911 center. Bodis's wife told him that another 911 dispatcher had learned from the paramedics at the scene that the call from SafePlace involved a drug overdose rather than a back injury. The dispatcher also told Bodis's wife that the dispatcher had seen a video made by the paramedics at SafePlace.

Upon learning that the SafePlace call involved a potential drug overdose, Police Chief Bodis called defendant Mark J. Gaertner, the prosecuting attorney for Huron County. Bodis explained the situation to Gaertner, who told him that SafePlace needed to be secured and investigated. Next, Bodis called the president of the board of SafePlace, informed him of the incident, and expressed displeasure that Lieutenant Rothe had not been admitted. Bodis called Gaertner back to apprise him of his call with the board president and express his concerns about the safety of the SafePlace residents because he did not know what type of drug was involved in the overdose or who continued to have access to it. They discussed whether a warrant was required or whether exigent circumstances justified a warrantless entry because of the potential destruction of evidence and concern for the residents' safety. Gaertner instructed Bodis that a warrant was not necessary and that immediate action was appropriate to prevent the destruction of evidence.

At about 8:30 a.m., Weisenbach arrived at the police station and met with Bodis and Rothe. Rothe and Weisenbach then departed for SafePlace. Their plan, which they had discussed with Bodis, was for Rothe to ask to be let in to conduct a police investigation and, if that failed, for Weisenbach to use her position as a board member and prosecutor to get inside. Neither possessed a search warrant.

When Rothe and Weisenbach arrived at SafePlace, Brooks refused to let them enter, claiming that it was SafePlace's policy not to let law enforcement personnel enter

the building.  Rothe explained several times to Brooks that he needed to gain access to investigate a possible crime and that if Brooks would not let him in, he would have to place her under arrest.  The accounts of the parties diverge at this point.  Brooks claims that Weisenbach physically attempted to push open the door and step inside, thus forcing Brooks to step away from the door.  Rothe's police report states that Brooks's verbal denials became physical obstruction and that Brooks put her hands on Weisenbach's chest to keep her out of SafePlace.  In his deposition, Rothe stated that Weisenbach went into SafePlace first and that the conflict got a "little heated," but did not mention any physical contact between Brooks and Weisenbach.

While Weisenbach was attempting to gain entry to SafePlace, Rothe conferred by telephone with Bodis, who in turn spoke with Gaertner.  Gaertner, Bodis, and Weisenbach all felt that Brooks should be arrested.  Rothe accordingly arrested Brooks on two counts of resisting and obstructing a police officer.  Brooks was taken to jail and was released later that day on bond.  She suffered no physical injuries as a result of the events at SafePlace and later testified that Rothe  never threatened her with any sort of physical force.  In August 2006, Gaertner filed a Motion/Order of Nolle Prosequi, voluntarily dismissing the charges against Brooks.

**B.     Procedural history**

Brooks filed the instant action in the United States District Court for the Eastern District of Michigan in November 2006.  Her complaint was based in part on 42 U.S.C. § 1983, and included allegations that the defendants—Rothe, Bodis, Weisenbach, and Gaertner (the individual defendants), along with Huron County and the City of Bad Axe (the municipal defendants)—had violated her rights under the First, Fourth, Fifth, and Fourteenth Amendments.  Brooks also asserted state-law claims for assault and battery, false arrest, false imprisonment, and gross negligence against the individual defendants, and sought to impose vicarious liability against the municipal defendants based upon the acts of the individuals.

In October 2007, the district court issued an order concluding that (a) Brooks could not sustain a claim for excessive force, (b) Michigan law permitted a conviction

for resisting a police officer even if the order being resisted was unlawful, (c) absolute prosecutorial immunity did not protect Weisenbach and Gaertner, and (d) summary judgment for the municipal defendants on municipal-immunity grounds was not appropriate. The court then sought supplemental briefing on two issues: "(1) the legal basis for [Brooks's] standing, if any, for asserting a violation of her rights under the Fourth Amendment based on Defendant Rothe and Weisenbach's entry into the shelter; and (2) the factual basis for probable cause, if any, for an entry into the shelter to investigate a resident's purported drug overdose."

After receiving the requested supplemental briefing, the district court issued a final order disposing of the case. It concluded that Brooks had standing to challenge Rothe and Weisenbach's entry into SafePlace, but granted summary judgment to the defendants on Brooks's § 1983 claims because it found that the entry was justified by exigent circumstances, meaning that no constitutional violation had occurred. The court then declined to exercise supplemental jurisdiction over Brooks's state-law claims and dismissed them without prejudice. This timely appeal followed.

## II. ANALYSIS

### A. Summary judgment standard

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins*, *Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.     Federal claims**

*1.     Characterization of Brooks's claims*

Brooks's complaint includes claims brought against all defendants based on 42 U.S.C. § 1983, which provides a cause of action where a person acting under the color of state law has deprived a plaintiff of a right secured by the Constitution or the laws of the United States. *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). The district court construed Brooks's claim as a challenge to the constitutionality of Rothe and Weisenbach's warrantless search of SafePlace. Although we agree with the district court's ultimate conclusion that the defendants' entry into the shelter was justified based on exigent circumstances, we believe that Brooks's § 1983 claim is best characterized as an argument that the defendants violated her Fourth Amendment rights by arresting her without probable cause. Indeed, Brooks agreed with this characterization of her claims both in her supplemental briefing before the district court and during oral arguments before this court. We will therefore proceed to analyze the legality of Brooks's arrest.

*2.     Wrongful arrest*

Brooks's § 1983 claim hinges on the legality of her arrest for resisting or obstructing Lietenant Rothe. A person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim based on the Fourth Amendment guarantee that government officials may not subject citizens to searches or seizures without proper authorization. U.S. Const. amend. IV; *Gardenhire v. Schubert*, 205 F.3d 303, 312-13 (6th Cir. 2000). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "The validity of the arrest does not depend on whether the suspect actually committed a crime. . . ." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Thus, "in order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). "Probable cause exists if the facts and circumstances known to the officer warrant a

prudent man in believing that the offense has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2002) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)).

Brooks was arrested for violating the following Michigan statute:

Except as provided in subsections (2), (3), and (4) [which provide for enhanced penalties for certain offenses], an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both.

Mich. Comp. Laws § 750.81d(1). The statute defines "obstruct" as including "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." § 750.81d(7)(a). "Person" is defined to include a "police officer of this state." § 750.81d(7)(b). Our task is therefore to determine whether Rothe had probable cause to believe that Brooks had violated § 750.81d(1).

Brooks argues, as a threshold matter, that she could not have violated § 750.81d(1) because the command she was resisting was not "lawful." This argument fails for two reasons. First, a straightforward reading of the language of § 750.81d(7)(a) provides that the law can be violated in two ways: by physically resisting a command, whether lawful or unlawful, *or* by refusing to comply with a lawful command without using force. This reading is supported by the Michigan Court of Appeals' opinion in *People v. Ventura*, 686 N.W.2d 748 (Mich. Ct. App. 2004), where that court held that "[a] person may not use force to resist an arrest made by one he knows or has reason to know is performing his duties regardless of whether the arrest is illegal when charged pursuant to MCL 750.81d. . . . [Section] 750.81d does not require a showing that defendant's arrest was lawful[.]" *Id.* at 752. Brooks's argument that Rothe's command was unlawful can therefore succeed only if her actions involved no physical interference.

But Brooks's own deposition testimony establishes that she did more than passively refuse to comply with Rothe's order to admit him and Weisenbach to SafePlace:

Q. Did either [Rothe or Weisenbach] try to physically open the door and gain access?

A. Yes.

Q. And by doing so—what was your response when they tried.

A. Elizabeth Weisenbach pushed on the door, *and I had my left hand on the door and my left foot by the door.*

Q. And what happened then?

A. Elizabeth Weisenbach pushed the door open, she stepped inside the building. She put her hands up and her fingertips on my shoulder and pushed me back.

Q. Okay. When Elizabeth Weisenbach pushed the door, I take it you responded by either being forced to step back or stepping back voluntarily?

A. Yes.

Q. Which is it?

A. *I was forced to step back.*

Q. Okay, so you had your left foot in the door and your left hand on the door?

A. I had my left hand on the door and my left foot by the edge of the door, the bottom edge of the door.

Q. And then Elizabeth Weisenbach pushed the door from the outside into the interior of the facility, correct?

A. Yes.

Q. Are you sure it was her that pushed, in other words, did you see her pushing?

A. No.

Q. Okay. So why do you think it was her?

A. Because she was the first one to step into the door and it was so fast.

Q. Okay. So you're just following logic?

A. Yes.

Q. Okay. And as a result of that, you were forced to step back?

A. Yes.

Q. And when you stepped back, how far, a foot or two?

A. *A step.*

Q. One step? Elizabeth Weisenbach then placed both of her hands on your shoulders?

A. Yes.

Q. And your telling me that she pushed you further back?

A. Yes.

Q. Okay. What did you do in response?

A. Stepped back.

(Emphasis added.)

As the above testimony illustrates, Brooks actively blocked the door with her hand and foot so that Rothe and Weisenbach could not enter the building without forcing the door open. Even when Weisenbach and/or Rothe (Brooks was not sure who pushed on the door) physically pushed it open, Brooks would only yield a step or two at a time. This makes clear that Brooks physically obstructed Rothe and Weisenbach's entry into SafePlace, meaning that under the text of § 750.81d(7)(a) and the Michigan Court of Appeals' language in *Ventura*, whether Rothe's command was lawful or unlawful is irrelevant.

Second, even if we were to accept Brooks's argument that her behavior amounted to a simple refusal to comply with Rothe's command, and that the lawfulness of the command is therefore relevant to the analysis, Brooks's argument falls short. That is because Rothe's demand to be admitted to SafePlace was justified by exigent circumstances—the possibility of destruction of evidence and the risk of serious injury to other shelter residents, including children—and was therefore lawful.

The requirement that officers must possess a warrant to conduct a search is subject to several exceptions. One of those exceptions is the presence of exigent circumstances. *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008) (citing *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978)). Among the types of circumstances

that this court has held to qualify as "exigent" are the imminent destruction of evidence and a risk of danger to the police or others. *Id.* A court must review the "totality of the circumstances and the inherent necessities of the situation" as it then existed to determine whether exigent circumstances were present. *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996) (citations and internal quotation marks omitted). The inquiry focuses not on an officer's subjective intentions, but on whether an objectively reasonable officer could have believed that exigent circumstances existed. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994).

The district court persuasively explained its reasoning for concluding that Rothe reasonably believed that there was an imminent threat of destruction of evidence:

> Here, Plaintiff placed a call to 911 regarding a resident with back pain. Subsequently, the paramedics identified the medical need as involving a drug overdose, rather than back pain. This new information, as well as the existence of the discrepancy, was communicated to the 911 dispatch supervisor, who conveyed that information to Defendant Bodis. This information was also related to Defendant Rothe. Thus, the information objectively available to an officer at the scene, regardless of Defendants' subjective intentions, was that a person had overdosed on drugs and that an attempt was made to conceal that fact from police. Further, Plaintiff had twice barred entry to Defendant Rothe, even though he first arrived on the premises directly after Plaintiff had placed a call to 911 requesting assistance. On these undisputed facts, an objectively reasonable police officer could have concluded that evidence would be imminently destroyed. Accordingly, exigent circumstances existed, where the additional time spent getting a warrant would have jeopardized the likelihood of finding the evidence of possession or use of drugs still on the scene.

*Brooks v. Rothe*, No. 06-14939-BC, 2008 U.S. Dist. LEXIS 1422, at *17-18 (E.D. Mich. Jan. 9, 2008).

Another exigent circumstance was the threat of serious harm posed to other shelter residents. Rothe could not be sure at the time that he sought entry to SafePlace what type of drug MR had overdosed on. Rothe had good reason to suspect, due to Brooks's efforts to keep him out of the shelter and her apparent concealment of information regarding the overdose, that other residents may have been using illegal

drugs as well. At the very least, he knew that other women and children were staying in the shelter, and could thus have justifiably believed that those residents were at a high risk for further drug-related injuries. Considering this factor in conjunction with the imminent risk of destruction of evidence, we can safely conclude that exigent circumstances justified Rothe's demand to enter the shelter without a warrant. Brooks's argument that she was simply resisting an unlawful command accordingly fails.

Having established that Rothe's demand to be admitted to the SafePlace premises was lawful, we are left to determine whether the facts known to Rothe would "warrant a prudent man in believing that the offense [a violation of § 750.81d(1)] ha[d] been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). Brooks admits that Rothe identified himself as a police officer, and the circumstances of his arrival, i.e., in direct response to her 911 call, established that she either knew or had reason to know that Rothe was a police officer and was performing his duty. Rothe stated to Brooks several times that he needed to enter the shelter to investigate a crime scene, and that if Brooks did not admit him, he would arrest her. Yet Brooks admits that she repeatedly refused to obey Rothe's commands and even placed herself behind the door in a way to prevent him from entering. In light of these circumstances, Rothe clearly had probable cause to believe that Brooks had obstructed him from performing his job.

Because we conclude that Rothe's demand to enter SafePlace was lawful and that he had probable cause to believe that Brooks's action violated § 750.81d(1), Brooks's claim of a wrongful arrest under § 1983 fails. *See Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2007) ("In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause."). Brooks's § 1983 claims against all of the other defendants are derivative of her claim against Rothe, and were therefore properly rejected by the district court as well.

**C.      Brooks's state-law claims**

Upon dismissing Brooks's federal claims, the district court properly declined to exercise supplemental jurisdiction over Brooks's remaining state-law claims.  "Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction.  If the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Wojnicz v. Davis*, 80 F. App'x 382, 384-85 (6th Cir. 2003) (citing *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992)).

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

————————————

**DISSENT**

————————————

KAREN NELSON MOORE, Circuit Judge, dissenting.

*1. Wrongful Arrest*

I agree with the majority that Brooks's claim should be characterized as a Fourth Amendment challenge to her arrest rather than to the search of SafePlace. I also agree with the majority's determination that an individual can violate Mich. Comp. Laws § 750.81d(1) by physically resisting any command or by refusing to comply with a lawful command. However, I respectfully dissent from the majority's conclusion that Brooks did more than passively refuse to comply with Rothe's order. Taking the facts in the light most favorable to Brooks, as we must on summary judgment, I would conclude that Brooks did not use force to resist Rothe's order. Although Brooks did not open the door, keeping a door closed is a non-violent way to resist a search; she did not slam the door on the police or force her body against it when they tried to enter. The fact that Brooks opened the door only a little bit, that she used her hand and foot to prevent it from opening entirely, and that she did not quickly back away from the door as soon as the Rothe ordered her to let them enter and search SafePlace does not indicate that she was using or threatening force to resist Rothe's order. The majority's holding would leave individuals with little room to passively resist unlawful police orders, as even keeping a door open a crack while speaking with officers is deemed physical obstruction under the majority's misguided view.

Additionally, I would hold that Brooks has made a sufficient showing that she was resisting an unlawful command. Rothe and Weisenbach did not have a warrant to search SafePlace. The majority concludes that the search was justified by exigent circumstances, specifically the possibility that evidence would be destroyed and the risk of injury to other SafePlace residents. We have explained that "'[w]hen there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances.'" *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir.

2008) (quoting *United States v. Chambers*, 395 F.3d 563, 565 (6th Cir. 2005)).  Taking the facts in the light most favorable to Brooks, I would hold that the government has not met its burden of establishing exigent circumstances.  *See id.*

Significantly, the timeline belies the exigency; the initial 911 call was made at about 7:10 a.m., the ailing service participant had been removed from SafePlace by 8:00 a.m., and Rothe and Weisenbach did not leave the police station to search SafePlace until 8:30 a.m.  The fact that at least half an hour passed between the end of the incident and the arrival of the police makes it unlikely that there was any urgency related to the destruction of evidence; if someone planned to destroy anything, this window of time would have provided him or her with more than enough time to do so.  Additionally, the only information that the police possessed at this juncture was that a drug overdose may have occurred at SafePlace and that Brooks may have tried to conceal the fact that an overdose occurred.  They did not know what kind of drugs might have been taken, how much might have been taken, whether the individual had taken the drugs at SafePlace, or whether there were more drugs present at SafePlace.  The paramedics did not report any dangerous conditions existing at SafePlace, and Brooks does not have medical training that would permit her to diagnose accurately the medical complaints of a SafePlace resident.  If the exigent-circumstances doctrine justifies a search under these facts, then almost any indication that a drug overdose has occurred in a structure in which other people are present will permit a warrantless search of that structure.  Such an extension of warrantless searches violates our Constitution.

Taking the facts in the light most favorable to Brooks, I would conclude that Rothe's order that Brooks permit Rothe to search SafeHouse was an unlawful order because it was not supported by a warrant or by exigent circumstances.  Additionally, I would conclude that Brooks has made a sufficient showing that her arrest was not supported by probable cause because § 750.81d(1) does not criminalize the passive, non-physical opposition of such an unlawful order.

*2. Qualified Immunity*[1]

Because I would hold that the defendants-appellees violated Brooks's Fourth Amendment rights by arresting her without probable cause, I must address the second aspect of qualified-immunity analysis; whether the defendants-appellees violated Brooks's clearly established rights. *Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 815 (2009). I believe that Brooks has sufficiently alleged that her clearly established rights were violated. First, it is abundantly clear that no arrest should take place without probable cause and that a warrantless search cannot be conducted in the absence of a warrant exception such as exigent circumstances. *See Purcell*, 526 F.3d at 960; *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008). Additionally, delving into the specific facts of this case, I believe that a reasonable person would have known that he or she was violating Brooks's clearly established constitutional rights. *See Pearson*, 129 S. Ct. at 815.

At his deposition, John Bodis, the chief of police in Bad Axe, made the following statements regarding Brooks's arrest:

> Q: Does an officer in your department based on your policies have the right to arrest a citizen who has peacefully disobeyed an unlawful command issued by that officer?
> A: So you're saying there's no law to support what his command is?
> Q: I'm saying it's an unlawful command.
> A: *If it's unlawful, then they should not arrest.*

Record on Appeal at 584 (Bodis Dep. at 39) (emphasis added). This statement by the man responsible for running the Bad Axe police department indicates that a reasonable officer should have known that it was not proper to arrest someone for non-violently refusing to comply with an unlawful order. That is exactly what Brooks alleges

---

[1] As Bad Axe and Huron County are municipalities, they are not entitled to qualified immunity. *See Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 822 (2009).

happened at SafePlace. Accordingly, I would conclude that none of the defendants-appellees are entitled to qualified immunity.**2**

*3. Absolute Prosecutorial Immunity*

Weisenbach and Gaertner assert that they are entitled to absolute prosecutorial immunity. This court has explained the boundaries of prosecutorial immunity as follows:

> The Supreme Court has endorsed a functional approach for determining whether an official is entitled to absolute prosecutorial immunity, explaining that a court should look to the nature of the function performed, not the identity of the actor who performed it.
> This functional approach focuses on whether the prosecutor's activities are intimately associated with the judicial phase of the criminal process. Those acts that occur in the course of the prosecutor's role as an advocate for the state, e.g., acts taken to prepare for the initiation of judicial proceedings or to prepare for trial, are protected by absolute immunity. By contrast, a prosecutor who performs the investigative functions normally performed by a detective or police officer such as searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested is entitled only at most to qualified immunity.

*Cooper v. Parrish*, 203 F.3d 937, 946-47 (6th Cir. 2000) (internal quotation marks and citations omitted). Weisenbach and Gaertner assert that they are entitled to absolute immunity because they were acting in their prosecutorial roles when they consulted with the police and because they did not arrest Brooks themselves.

The Supreme Court has held that prosecutors are not entitled to absolute immunity when they are performing "the prosecutorial function of giving legal advice to the police." *Burns v. Reed*, 500 U.S. 478, 495-96 (1991). Much of what Weisenbach and Gaertner did in this case was to advise the police; Weisenbach did so from the scene,

---

**2**Although each of the individual defendants-appellees played a slightly different role in the incident, Brooks has sufficiently established that the actions of each individual combined to cause the violations of her constitutional rights. Indeed, the facts indicate that each defendant-appellee either participated in or determined that it was proper to order the search and the arrest. Rothe was the officer on the scene ultimately responsible for conducting the search and arresting Brooks, but he did not act without consulting Weisenbach and Bodis, and Bodis did not act without consulting Gaertner.

and Gaertner provided advice over the telephone. Similarly, Weisenbach's actions were not in service of preparing a case; instead, she was helping the police conduct their investigation and hoping to use her position as a SafePlace board member to do so. Because neither Weisenbach nor Gaertner was acting within the advocacy-based prosecutorial role during this incident, I would hold that the district court correctly concluded that neither is entitled to absolute immunity.

*4. Municipal Immunity*

Huron County and Bad Axe assert that, as municipalities, they are immune from liability. The Supreme Court has explained that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Court later clarified this holding: "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Such municipal liability attaches where "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481.

As the district court noted, neither Bad Axe nor Huron County addressed the possibility that municipal liability can be predicated on a single action taken by a final decisionmaker. *Brooks v. Rothe*, No. 06-14939-BC, 2007 WL 3203761, at *7 (E.D. Mich. Oct. 31, 2007). Nor do they confront this argument on appeal; Bad Axe failed to address municipal liability in its appellate brief, and Huron County's appellate brief focuses on the fact that Brooks has not identified a municipal policy or custom or pattern of behavior that led to her alleged injuries. I believe that Bad Axe and Huron County may be liable for Brooks's injuries because she has made a sufficient showing that her arrest and the search of SafePlace were the result of decisions made by the final decisionmaker for each municipality. Brooks has alleged that her arrest and the search of SafePlace were ordered and/or consented to by the police chief of Bad Axe and Huron

County's prosecuting attorney, both of whom had authority over such matters in their respective municipalities. Accordingly, I would conclude that it is inappropriate to grant Bad Axe or Huron County immunity as municipalities at this stage of litigation.

*5. Conclusion*

Because I conclude that the defendants-appellees violated Brooks's Fourth Amendment rights to be free of arrest without probable cause and that immunity does not protect the defendants-appellees from liability, I would reverse the district court's grant of summary judgment on Brooks's federal claims and remand for further proceedings. I would also reverse the district court's dismissal of Brooks's state-law claims and remand those claims so that the district court can reevaluate its decision to decline to exercise supplemental jurisdiction given that it should proceed on Brooks's federal claims.