**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0648n.06

No. 10-3520

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Aug 31, 2011*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| VIVIAN SKOVGARD; PERCY GROS, JR., | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| Plaintiffs-Appellants, | ) | COURT FOR THE SOUTHERN |
|  | ) | DISTRICT OF OHO |
| v. | ) |  |
|  | ) |  |
| JEFF PEDRO, P.O.; MIKE MANNIX, P.O.; CITY OF | ) | **OPINION** |
| KETTERING, | ) |  |
|  | ) |  |
| Defendants-Appellees. | ) |  |
| _____ | ) |  |

**Before: SUTTON and WHITE, Circuit Judges; STAFFORD, District Judge.**[*]

**HELENE N. WHITE, Circuit Judge.** Plaintiffs-Appellants Vivian Skovgard (Skovgard) and Percy Gros, Jr. (Gros) (collectively, plaintiffs) are long-time anti-abortion advocates, whose activities outside of the Women's Med + Center (the Center), an abortion clinic in Kettering, Ohio, include counseling, praying, picketing, and distributing literature. On March 2, 2007, Alex Kaminski (Kaminski), the Center's security guard, called the police to report that plaintiffs were trespassing on the Center's property. Officers Jeff Pedro (Pedro) and Mike Mannix (Mannix) responded to the call and ultimately arrested plaintiffs. Charges against the plaintiffs were later dismissed when it was determined that they had been on the public right-of-way adjacent to the Center. Plaintiffs then filed actions against the officers, Kaminski, the company that employed

---

[*]The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

1

Kaminski, and the City of Kettering (the City). Pedro, Mannix, and the City (collectively,

defendants) sought summary judgment on all of plaintiffs' claims, which the district court granted.

Subsequently, plaintiffs voluntarily dismissed their claims against the remaining defendants and

appealed the district court's summary judgment decision. We **AFFIRM**.

**I.**

**A.**

The district court provided a comprehensive and fair account of the factual background:

A. <u>Background on the Center, Kaminski, Skovgard and Gros</u>

The Center[2] is surrounded on three sides by roadways. To the south is Stroop Road, which presently has a sidewalk, but has not always had such. To the west is Vineyard Avenue, which has had a sidewalk at all times relevant to this litigation. To the north is Wheatland Avenue (the location of the incidents in question in this litigation), which does not have a sidewalk. In the grassy area along Wheatland Avenue, there is a fire hydrant. Pedestrians sometimes walk on that grassy area to avoid traffic on the street.

1st Choice [Security, Inc. (1st Choice)] provided security services for the Center, and, assigned Alex Kaminski as a security guard to the Center, in January 2007. The Center (which is not a party in this litigation) never advised Kaminski of the extent of its property or the existence of a public right-of-way along the northern portion of the property that abuts Wheatland Avenue.

Plaintiff Vivian Skovgard has been praying, protesting and attempting to counsel women outside of the Center four days a week for approximately six hours a day, since 1989. In so doing, she sometimes walks along the grass on Wheatland Avenue, staying within three to four feet of the roadway. Skovgard was arrested numerous times, between 1989 and 1995, in various parts of the country (including Alabama, Kansas and Texas) and convicted of criminal trespass in some instances, as a result of blocking access to various abortion clinics. However, her only confrontation with police at the. . .Center was in "two thousand something" when she was either detained or arrested (and then [immediately] released) for trespassing

---

[2]Plaintiffs also refer to the Center as the "Haskell Clinic."

when she walked on the Center's driveway to hand literature to a person leaving the facility in a car.

Plaintiff Percy Gros has been regularly protesting and praying at the Center since 1987. In so doing, he walked in the grass along Stroop Road (before a sidewalk was added) and has also walked in the grass along Wheatland Avenue "many, many times[.]" When walking along Wheatland Avenue, Gros always stays within a couple of feet of the roadway. During the twenty year period that he has been present at the Center, the police have occasionally been to the Center while Gros was there, but had never indicated to Gros that he was not allowed to walk on the grass along Wheatland Avenue, prior to the incident on March 2, 2007. Gros was arrested twice in 1987, once at the Center and once at another abortion clinic in Dayton, Ohio, and convicted both times for disturbing the peace.

B. Incident at Center on March 2, 2007

On March 2, 2007, Skovgard arrived at the Center around 9:30 a.m. and spent most of her time on the sidewalk along Vineyard Avenue, prior to Gros's arrival. When Gros arrived, he walked in the grassy area along Wheatland Avenue, staying within three feet of the road.[3] Kaminski soon approached Gros with a threat to call the police if Gros did not get off the grass. When Gros ignored him, Kaminski leaned into Gros, making physical contact with him, and then accused Gros of assaulting him. Gros reacted by continuing to walk as before, while Kaminski went into the Center to call the police department to report that Gros and Skovgard were trespassing and to retrieve a video camera. Skovgard then joined Gros, walking along the grassy area on Wheatland Avenue.

Officers Pedro and Mannix arrived soon thereafter and initially spoke with Kaminski. Kaminski advised the officers that he had asked Gros and Skovgard to leave the Center's property on the grassy area on the north side of the clinic, but they had refused. Kaminski also informed them that the Center wanted Gros and Skovgard off the grass and back onto the sidewalk to conduct their protests. According to Pedro, at this time Gros was fifteen feet off of Wheatland Avenue, while, at his deposition, Mannix testified that Gros and Skovgard were approximately ten feet into the grassy area when he arrived. (This is in contradiction to the testimony of Gros and Skovgard who stated that they always stay within three to four

---

[3] Gros had made the decision to walk along Wheatland Avenue on this day because Skovgard previously told Gros that Kaminski had told her that she was not allowed to walk on the grass and Gros wanted to "basically make a statement to say [Skovgard] is not the only person that is protesting here . . . . [b]y leaving his footprints [in the snow along Wheatland Avenue.]"

feet (or a couple of feet) of the roadway.) The officers believed that the edge of the roadway marked the Center's property line.[4] The officers several times told Gros and Skovgard that they needed to get off the grass and encouraged them to continue their protests on the sidewalk, but Gros and Skovgard continued walking in the grass. The officers then stated that they would arrest Gros and Skovgard if they did not get off the grass, at which time both Gros and Skovgard told the officers that they did not have to get off the grass because it was public right-of-way. Gros also mentioned that they had been protesting on that property for over twenty years and had never been harassed by the police before. Nevertheless, the officers handcuffed and arrested Gros and Skovgard for criminal trespass, transporting them to the police station and detaining them in the City jail.

Ultimately, the charges were dismissed against Gros and Skovgard when it was determined that they were protesting within the public right-of-way. The public right-of-way on Wheatland Avenue extends 25 feet from the centerline of the road. It is unclear how wide the road is or how many feet the right-of-way extends into the grassy area along Wheatland Avenue.[5] . . . .

C. Facts Pertaining to Municipal Liability

At his deposition, Lieutenant [James] Knickle [(Knickle)], of the Kettering Police Department, testified that Pedro and Mannix acted in accordance with the City's policies, procedures and training, in the course of the arrests of Gros and Skovgard, on March 2, 2007. Knickle is familiar with the history of the regular presence of protestors at the Center, including a mass protest in the early 1990s, where large groups blocked the door of the Center and the police made arrests for criminal trespass. Prior to the incident involving Gros and Skovgard, in 2007, however, the City did not provide any training to its officers regrading how to

---

[4]"When asked why he assumed that the Center's property line was at the edge of the street, Pedro testified that 'all of my prior understanding and training told me that basically property is property. If . . . a person's property is basically the established property line, that the edge of the grass leading up to the sidewalk and everything inside that is their property.'"

[5]"A hand-sketched drawing from the Kettering City Engineer indicates that the right-of-way extends approximately 14.5 feet into the grassy area on either side of Wheatland Avenue. However, Gros testifies that the City Engineer did not know how wide the street was, when he prepared the sketch, so the numbers on the sketch would appear to be estimates. The Plaintiffs also point to photographs contained in the record, which were taken in the course of a survey of the property, but there is no indication in the photographs of how many feet the right-of-way extends into the grass."

identify or handle trespass issues at the Center. After acknowledging that protestors were arrested for criminal trespass, during the mass protest at the Center in the early 1990s, Knickle was questioned about training with regard to trespass issues. A pertinent part of his deposition reads:

Q       Okay. So it's fair to say that dating back say – at least say to the 1990s which is when I know a lot of that activity happened, criminal trespass was a charge that the – or situation that the police and the Kettering courts had to deal with?

A       Correct.

Q       And do you recall any specific training that the [C]ity of Kettering ever gave to the police officers dealing with trespassissues at that clinic? For example, where are the property lines, where are the protesters allowed to walk, where can't they walk. Sometimes there [are] sidewalks along some side of the clinic. Other side of the clinic, there are no sidewalks. I've just thrown a lot at you but do you recall any kind of training to address that location in particular with the history of protest then?

A       Prior to this incident in 2007, no.

Lieutenant Knickle testified that, although the City did not conduct any training specific to trespass issues at the Center, it had conducted training specific to the Center on the "logistics of how we were going to respond if we were required to make mass arrests and – specifically, you know, what the logistics would be if we brought in buses and the use of flex cuffs versus regular handcuffs and how we would process personnel."

Pedro confirms Knickle's testimony in stating that, prior to the incident in March 2007, he never received any training or instruction about how to handle protestors at the Center, except on the occasion of the mass protest in the early 1990s when the City instructed him on how to handle the unique aspects of that anticipated event. He also received no training or instruction about the property lines or public right-of-way around the Center. Likewise, Mannix had received no training regarding public rights-of-way or property lines, or any training pertaining to handling issues specific to the Center, with the exception of the instructions pertinent to the earlier mass protest, as described by Pedro. As to other police training, both officers had attended basic peace officer training, as well as in-service training provided by the City.

With regard to the incident in March 2007, Lieutenant Knickle followed up on the same by talking with Officer Pedro and visiting the site in question. He concluded that the officers had acted in accordance with the City's policies and procedures when they made the arrests in question. Soon thereafter, the City provided its police officers with an aerial photograph of the property surrounding the Center. The City also provided its officers instruction concerning the Center's property boundaries and how they related to making arrests for criminal trespass.

**B.**

On March 3, 2008, plaintiffs filed suit against Pedro, Mannix, 1st Choice, and Kaminski, alleging (1) warrantless, unreasonable, and unconstitutional seizure and detention, in violation of the Fourth Amendment; (2) deprivation of the freedoms of speech and assembly and retaliation for the exercise of speech, in violation of the First Amendment; (3) deprivation of liberty without due process of law, in violation of the Fifth and Fourteenth Amendments; and (4) false arrest, false imprisonment, and malicious prosecution in violation of Ohio law. Plaintiffs filed a separate suit against the City, alleging inadequate training and/or failure to discipline the police officers, which resulted in the alleged First, Fourth, Fifth, and Fourteenth Amendment violations. The district court consolidated the cases.

Defendants filed a motion for summary judgment on all of plaintiffs' claims. The district court granted this motion, concluding that (1) Pedro and Mannix had probable cause to arrest plaintiffs; (2) plaintiffs had waived their First Amendment retaliation claims; (3) plaintiffs' First Amendment rights were not violated because Pedro and Mannix had probable cause to arrest them; (4) plaintiffs could not prevail on their Fourteenth Amendment due process claims because the Fourth Amendment, and not the Fourteenth Amendment, establishes procedural protections with respect to the criminal justice system; (5) it was unnecessary to determine whether defendants were

entitled to qualified immunity; (6) the City was not liable for a failure to train Pedro and Mannix because plaintiffs could not show that a constitutional violation had occurred; (7) the City was not liable for a failure to discipline or investigate because it did take steps to investigate the situation and to train its officers regarding the right-of-way at the Center after the alleged incident; (8) there were no facts presented to indicate that Pedro and Mannix deserved punishment given that they had "never been trained on tresspass/boundary issues at the Center"; and (9) Pedro and Mannix were entitled to immunity on plaintiffs' state law claims because they did not act with a "malicious purpose, in bad faith, or in a wanton or reckless manner."

Plaintiffs then filed a motion asking the district court to dismiss with prejudice their federal claims and dismiss without prejudice their state claims against defendants 1st Choice and Kaminski. The district court granted the motion, thereby terminating plaintiffs' case. Plaintiffs timely appealed the district court's summary judgment decision.

## II.

### A.

Plaintiffs claim that their "Fourth Amendment rights were violated when they were arrested for criminal trespass on March 2, 2007 because [p]laintiffs were always in the public right of way, neither" Pedro, Mannix, nor Kaminski "had any knowledge to the contrary or any knowledge about the boundaries of the property," and Pedro and Mannix "failed in their duty to investigate further after [p]laintiffs informed them about [p]laintiffs['] long history of protesting in that same area in full view of everyone." Defendants argue that plaintiffs' Fourth Amendment rights were not violated because Pedro and Mannix had probable cause to arrest plaintiffs for criminal trespass.

"We review the district court's grant of summary judgment de novo." *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir. 2011) (italics omitted). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Fourth Amendment guarantees "that government officials may not subject citizens to searches or seizures without proper authorization," and therefore "[a] person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim based on [this Amendment.]" *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "The validity of the arrest does not depend on whether the suspect actually committed a crime . . . ." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). As a result, "in order for a wrongful arrest claim to succeed under [42 U.S.C.] § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

"Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)) (internal quotations omitted). The probable cause inquiry "'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest,' where supported by 'reasonably trustworthy information.'" *Id.* (citation omitted). An officer who intends to execute a warrantless arrest is not

tasked with an "overly-burdensome duty to investigate." *Id.* In initially determining probable cause, an officer need not "investigate independently every claim of innocence." *Id.* (citing *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). "And after the officer determines, on the basis of the facts and circumstances known to him, that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence." *Id.* However, the officer's initial probable cause determination must be based on both "inculpatory and exculpatory evidence known to [him]," and the officer "cannot simply turn a blind eye toward potentially exculpatory evidence." *Id.* (citations and internal quotations omitted).

Authorization for an arrest typically depends on state law. *Id.* Here, Pedro and Mannix arrested plaintiffs for criminal trespass. In Ohio, an individual commits criminal trespass by "[k]nowingly enter[ing] or remain[ing] on the land or premises of another" absent "privilege to do so." Ohio Rev. Code § 2911.21(A)(1). The Ohio Code defines "privilege" as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." *Id.* § 2901.01(A)(12). "Ohio courts construe the lack-of-privilege requirement as an element of the offense of criminal trespass, and not an affirmative defense." *Logsdon*, 492 F.3d at 342; *see also State v. Newell*, 93 Ohio App.3d 609, 639 N.E.2d 513, 514 (1994).

## B.

Pedro and Mannix would have had probable cause to arrest plaintiffs if, on the basis of the facts known to them, they could have reasonably concluded that plaintiffs knowingly entered or remained on the Center's property without privilege. It is undisputed that plaintiffs were protesting

in a grassy area that reasonably appeared to be part of the Center's property, and that did not have a sidewalk indicating a public right-of-way. Pedro arrived on the scene in response to a report that two persons were refusing to leave the Center's property. He spoke to Kaminski outside the Center, and Kaminski stated that "he and the owner or representative of the building wanted [the two individuals on the grass] to be removed from the grassy area . . .[, but that they could continue their protest on] the sidewalk." Kaminski also told Pedro that he had asked plaintiffs to leave the grassy area, and that they refused to do so. Pedro testified that when Kaminski said that he and the owner wanted plaintiffs removed from the property, he motioned toward the Center and Pedro saw a female staff member (the Center's director is female) standing inside the doorway.[6] Pedro also "vaguely remember[ed] [Kaminski saying that he and Gros] had bumped into each other, or in the course of [Kaminski] advising [Gros] to leave, that they had made very slight physical contact." He did not give serious attention to Kaminski's complaint, however.

Pedro further testified that at the time, "he made a reasonable assumption that the [Center's] property lines were the edge of the grass on the north end of the property, and then the sidewalk along the east side of the street and [the] sidewalk along the south side of the street." This assumption was based on "[his] prior understanding and training that . . . . [i]f an individual or a person's property is basically the established property line, that the edge of the grass leading up to

---

[6]Melissa Goode (Goode), the Center's director, testified that she observed Pedro speaking with plaintiffs, but did not approach Pedro because she had not seen what had transpired. Goode also stated that Kaminski came into her office and told her that he had called the police because he had walked out to ask Gros to move away from the grass and Gros "shoved him or pushed him out of his way." Kaminski did not ask for Goode's permission to call the police, but Goode did not reprimand him for doing so, and she did not subsequently speak to the officers about the matter.

10

the sidewalk and everything inside that is their property." Pedro testified that during his police training on the issue of criminal trespass, he was taught that a business property would generally be surrounded by a parking lot, which would come "out to the edge of typically a grassy area leading up to a public sidewalk, and that would extend the boundaries of the property."

After talking with Kaminski, Pedro went to speak to Gros, who was walking back and forth in the grassy area while holding a cross. According to Pedro, Gros was approximately fifteen feet from the edge of the grass. Skovgard was also walking in the grassy area close to Gros. Pedro asked plaintiffs to move to the sidewalk, and Gros refused to do so. Pedro asked plaintiffs to move three more times, and Gros refused each time.[7] Although Pedro directed his comments at plaintiffs, "Gros did all the talking." Pedro recalled Gros saying that they had a right to walk on the easement and that they had been protesting at the Center for a long time while Skovgard "was in the background supporting what []Gros had to say." After Pedro's third request that they move to the sidewalk, Gros asked to see a judge. Plaintiffs also refused to provide their identification cards to Pedro. Pedro ultimately informed plaintiffs that if they did not want to move to the sidewalk, Pedro would have to arrest them because the property owner wanted them removed from the property. He then proceeded to arrest Gros. Prior to leaving the scene, Pedro put Gros's cross in the front seat of Gros's vehicle and assisted Gros in securing his vehicle, which was parked outside the Center.

---

[7]Skovgard testified that she did not hear either officer say that she had the option to move to the sidewalk, but acknowledged that she may have been distracted because she was "calling her husband and talking to him" during her interaction with the officers. Gros admitted that Pedro told him at least once that he could "picket in the street" and stated that Pedro just wanted Gros and Skovgard to "get off the grass."

Mannix arrived toward the end of Pedro's conversation with plaintiffs. He observed plaintiffs standing on the grass, approximately ten feet from the roadway. Mannix heard Kaminski say that he wanted Skovgard arrested because she had previously been trespassing on the property. While Pedro arrested Gros, Mannix asked Skovgard "if she was going to . . . get off the property and on the sidewalk." Skovgard responded that "she didn't have to, she was allowed to be where she was." Mannix testified that his understanding regarding the Center's property lines was consistent with Pedro's, as he believed that the Center's property encompassed the grassy area along Wheatland Avenue and stopped at the roadway. Because both officers believed that Skovgard was trespassing, Pedro made the decision to arrest her, and Mannix effected the arrest. Mannix then placed Skovgard in the police car and secured Skovgard's car. He also retrieved Skovgard's purse from her car for her. Shortly after the arrest, Kaminski met Pedro and Mannix at the police station upon their request and signed the criminal complaints against plaintiffs.

Thus, the dispute focuses on whether Pedro and Mannix were required to determine where the public right of way ended before effecting the arrests. Because the law does not clearly require such a determination, Pedro and Mannix are entitled to qualified immunity.

## C.

In determining the applicability of qualified immunity, we inquire whether: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[;]" and (2) was the right "'clearly established' to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citation omitted). "For a right to be

clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (citation and internal quotation marks omitted). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citations omitted). Public officials could "still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Courts may use their discretion to determine which prong of the test to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Supreme Court has never addressed whether in criminal trespass cases, officers, as part of the probable cause inquiry, must conduct an additional investigation where the alleged trespassers claim they are on a public right-of-way. The Fifth and Seventh Circuits, however, have explicitly concluded that officers have no duty to investigate the boundaries of a public right-of-way prior to making an arrest for criminal trespass when they receive reasonably trustworthy information that certain persons are trespassing on private property and actually see these persons on the property in question. *See Bodzin v. City of Dallas*, 768 F.2d 722, 724-25 (5th Cir. 1985); *Kelley v. Myler*, 149 F.3d 641, 646-47 (7th Cir. 1998). Although we have not yet decided a case that is factually similar

to *Bodzin*, *Kelley*, or the instant case, we have relied on *Kelley* for the proposition that "a duty to investigate is no part of the probable cause determination." *Gardenhire*, 205 F.3d at 322-23.

Pedro and Mannix arrested plaintiffs for criminal trespass on the basis of their training, observations, and the information provided by Kaminski. Unlike in *Logsdon*, they had personally observed the alleged trespassers in the area believed to be private property. Because a reasonable person in the officers' position would not have thought that he was acting unlawfully by failing to further investigate the boundaries of the public right-of-way before arresting plaintiffs, Pedro and Mannix are entitled to qualified immunity on plaintiffs' Fourth Amendment claims.

**III.**

Plaintiffs also argue that their First Amendment rights of freedom of speech and assembly were violated "when they were removed from the public right of way while peacefully protesting there." Defendants contend that no First Amendment violations occurred because Pedro and Mannix had probable cause to arrest plaintiffs for criminal trespass.

"Because of the importance of uninhibited, robust, and wide-open debate on public issues," the Supreme Court has "traditionally subjected restrictions on public issue picketing to careful scrutiny." *Frisby v. Schultz*, 487 U.S. 474, 479 (1988) (citation and internal quotations omitted). "'[T]ime out of mind' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Id.* at 480 (citation omitted) (alteration in original). In these fora, "[t]he State may . . . enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave

14

open ample alternative channels of communication." *Pouillon v. City of Owosso*, 206 F.3d 711, 715

(6th Cir. 2000) (citation and internal quotations omitted).

In *Logsdon*, the only case that is potentially on point, the plaintiff "engaged in anti-abortion

protest and counseling from the public sidewalk and public park adjoining [a clinic's] property, both

quintessentially public fora," and alleged that officers removed him "from the public fora, thereby

causing him to cease his protest and counseling, ostensibly for violating Ohio's criminal trespass

law." 492 F.3d at 345-46. The plaintiff also claimed that the officers demonstrated "a blatant bias

against [the plaintiff] and in favor of doing whatever [the clinic] wanted." *Id.* at 346. Because we

had already determined that the officers lacked probable cause to arrest the plaintiff, and because we

liberally construed the plaintiff's complaint, we concluded that the plaintiff had "stated a claim that

[the officers] violated his First Amendment rights by restricting his speech on the basis of content."

*Id.* We did not express any opinion as to whether the plaintiff would "ultimately succeed on his

claim following discovery." *Id.*

*Logsdon* does not control here. The officers in *Logsdon* attempted to destroy the plaintiff's

sign and arrested him immediately upon arriving on the scene. The court construed the plaintiff's

complaint as alleging that the defendant officers were "motivated by the content of his speech" and

"not by any purported criminal trespass." *Id*. Here, Pedro and Mannix encouraged plaintiffs to

continue their protest on the sidewalks bordering the Center, steering plaintiffs away from a location

the officers thought was private property to the public right-of-way, and assisted plaintiffs with

locking up their signs after arresting them. Because there is no evidence that Pedro and Mannix were

motivated by their desire to deter plaintiffs' speech rather than their belief that plaintiffs were trespassing, plaintiffs' First Amendment claims fail.

**C.**

Finally, plaintiffs argue that "reasonable minds could conclude that the policies, practices[,] and police training (or lack thereof) by the City of Kettering were the 'moving force' behind" the alleged constitutional violations committed by Pedro and Mannix. They claim that "the City conceded that it had never trained its police force on issue[s] of criminal trespass and First Amendment [r]ights," and that, through its Rule 30(b)(6) witness, "the City openly ratified and approved of the conduct of . . . Pedro and Mannix . . . ."

The seminal case on municipal liability under § 1983 is *Monell v. Department of Social Services*, 436 U.S. 658 (1978), where the Supreme Court held that municipalities can be sued directly under § 1983 if the action of the municipality itself can be said to have caused the harm, such as where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. Municipal liability for the actions of employees may not be based on a theory of respondeat superior, but it can be predicated upon grounds other than explicit expressions of official policy. *Id.* at 690-91, 694.

Subsequently, in *City of Canton v. Harris*, 489 U.S. 378 (1989), the Court held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. "To establish deliberate indifference,

the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (citing *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). A failure to investigate or the ratification of illegal acts can constitute evidence of an official "policy of deliberate indifference." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989); *see also Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985).

The evidence here does not in any way support a finding of deliberate indifference. Thus, the City is not liable to plaintiffs under theories of failure to train or failure to discipline or investigate.

### III.

For the abovementioned reasons, we **AFFIRM** the district court's grant of summary judgment to defendants.